IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  09-cv-02551-WYD-MJW

SCOTT MORRISON,

      Plaintiff,

v.

UNITED OF OMAHA LIFE INSURANCE COMPANY,

      Defendant.

---

## ORDER

---

## I.    INTRODUCTION

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment
[ECF No. 38], filed July 21, 2010.  I have also considered Defendant's Response to
Plaintiff's Motion for Summary Judgment and Brief and Motion for Judgment in
Defendant's Favor [ECF No. 45]; Plaintiff's Reply in Support of Plaintiff's Motion for
Summary Judgment [ECF No. 52]; and Defendant's Surreply in Opposition to Plaintiff's
Motion for Summary Judgment and Brief [ECF No. 59].

## II.    BACKGROUND

This lawsuit arises out of Defendant United of Omaha Life Insurance Company's
("Omaha Life") termination of the Plaintiff's disability benefits under a long-term disability
("LTD") plan.  The Plaintiff, Mr. Morrison, was insured under an employee benefit plan
that provided LTD benefits, pursuant to his employment as a heating and air

-1-

conditioning technician for Long Building Technologies.  The plan provided such

benefits under the terms and conditions of group policy number GLTD-801A, issued by

Defendant Omaha Life.  Omaha Life was the insurer with respect to benefits under the

plan and also had responsibility for determining claims under the plan.

### A.    The Plan Terms

In order to qualify for LTD benefits a claimant must demonstrate that he is

"disabled" within the meaning set forth in the policy.  The LTD policy at issue provided

one definition of "disabled" with respect to the first two years of coverage–known as the

"regular occupation period" or "own occupation period" and a second, more stringent

definition of "disabled" thereafter.  The policy provides:

> **Disability** and **Disabled** mean that because of an Injury or Sickness, a significant change in Your mental or functional capacity has occurred in which You are:
>
>> (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis, except if You are a pilot, You are unable to perform all the Material Duties of any Gainful Occupation for which You are reasonably fitted by training, education or experience; and
>>
>> (B) unable to generate Current Earnings which exceed 80% of Your Basic Monthly Earnings due to that same Injury or Sickness.

The plan further defines "injury" as an "accidental bodily injury which is the direct result

of a sudden, unexpected and unintended external force or element, such as a blow or

fall that requires treatment by a physician." [AR 22].  "Sickness" is defined as "a

disease, disorder or condition, including pregnancy, for which you are under the care of

a physician." [AR 24].  "Regular occupation" means the occupation that the claim is

"routinely performing when [his] Disability begins." [AR 24].

Under the terms of the plan, once Omaha Life has paid a monthly benefit for 2 years, the definition of "disability" and "disabled" change:

> After a Monthly Benefit has been paid for 2 years, **Disability** and **Disabled** mean You are unable to perform all of the Material Duties of any Gainful Occupation for which you are reasonably fitted by training, education or experience.

(AR 21-22).  The plan further defined "Gainful Occupation" as "an occupation that by training, education or experience is or can be expected to provide You with Current Earnings at least equal to 60% of Basic Monthly Earnings within 12 months of Your return to work." [AR 22].

In addition, the Policy also includes an exclusion for mental health issues. Specifically, it provides that benefits for a disability resulting from a "Mental Disorder" are limited to a twenty-four month period, unless the claimant is confined in a hospital at the end of the twenty-four month period. [AR 35].

Finally, the plan requires that LTD benefits be reduced by any award of Social Security Disability Income ("SSDI") benefits. [AR 1198].

### B.    Plaintiff's Medical History

Mr. Morrison has a history of cognitive difficulties, stemming in part from an attack in November 1986 during which (according to medical records subsequent to the attack) he was "assaulted with a hammer to the head and multiple fist attacks." [AR 363].  As a result of that attack, Mr. Morrison had depressed skull fractures and multiple facial injuries. [AR 360-362].

In 2004, Mr. Morrison tore his rotator cuff and required surgery.  Dr. Raeburn M.

Jenkins, MD performed the surgery on November 8, 2004.  Shortly thereafter, Mr.

Morrison reported having a biking accident in 2005 during which he re-injured his

shoulder and again required surgery.  MRI test results from June 6, 2005 showed

numerous tears of the tendons and ligaments in his shoulders.  [AR 1097].

On September 1, 2005, Dr. Straehley performed surgery to repair Mr. Morrison's

"chronic rotator cuff tear." [AR 344].  On October 27, 2005, Dr. Straehley performed

another surgery aimed at repairing Mr. Morrison's rotator cuff tear. [AR 349].  By

December 20, 2005, Mr. Morrison's condition had improved, but Dr. Straehley stated

Mr. Morrison was restricted from all overhead activities; that he could do no repetitive

overhead movements; that he would have "permanent" deficits with respect to his

shoulders; and that he would be unable to return to his previous occupation. [AR 529].

In January 2006, Drs. Straehley noted that the "massive tear was not completely

repairable." [AR 1122].  On August 27, 2007, Dr. Straehley's opinion was that Mr.

Morrison should have "permanent lifting restrictions of no more than 10-15 pounds

below chest height." [AR 994].

In May and June 2008, Mr. Morrison saw also Dr. James Hutcherson, M.D. for

evaluation of his ongoing back pain [AR 652-654] and Dr. George W. Leon, M.D. for the

same. [AR 656].  Dr. Leon noted that Mr. Morrison has "mild multilevel degenerative

change from T12 through L3 with moderate degenerative disc disease at L3-L4 and

severe degenerative disc disease at L5-S1." [AR 656].  On November 4, 2008, Dr.

Hutcherson provided an medical opinion that Mr. Morrison was limited to lifting 20

pounds on an occasional basis; lifting ten pounds on a frequent basis; that he could

stand/walk for no more than 2 hours each day; that he could sit for no more than 2 hours per day; that he would need to alternative sitting, standing, and walking to relieve discomfort every 20-30 minutes; that he could stand for 30-45 minutes without changing positions; that he would need to lie down at unpredictable intervals during a work shift; that he should never twist, stoop, crouch, or climb ladders; and that he could climb stairs occasionally. [AR 308-311]. Dr. Hutcherson further noted that Mr. Morrison should avoid concentrated exposure to noise due to his head injury. [AR 310]. Mr. Morrison also saw Victor Kupfer, MSPT, who prepared an opinion on November 11, 2008 that provided slightly different restrictions, including lifting of only 10 pounds on an occasional basis. [AR 174-177].

As part of the review of Mr. Morrison's claim, Omaha Life also scheduled a Functional Capacity Evaluation for April 22, 2008. The FCE showed that Mr. Morrison was able to lift 20 pounds from the floor and that Mr. Morrison attempted to lift 30 pounds. [AR 745]. The FCE report concluded that Mr. Morrison was able to perform sedentary and light occupations with a classification as sedentary. [AR 745]. The FCE report notes that Mr. Morrison arrived wearing his arm in a sling, but that "[t]hroughout the entire test, Mr. Morrison did not use the left shoulder/arm sling that he was wearing when he arrived." [AR 745]. Following the FCE, on May 13, 2008 Mr. Morrison wrote to Omaha Life stating that he had injured his back during the evaluation. [AR 787].

In May, 2008 Omaha Life wrote to Dr. Straehley to see if he concurred with Omaha Life's summation of the FCE. Dr. Straehley responded on July 9, 2008 that he did not agree, and instead stated that Mr. Morrison "has a legitimate long-term

disability." [AR 179].  He further indicated that Mr. Morrison "can do light activities, such as those required for personal care activities, but these cause pain from bone impingement." [*Id.*] Dr. Straehley therefore restricted Mr. Morrison "to the lightest type of work activity." [*Id.*] Thereafter Mr. Morrison continued to seek treatment, including physical therapy for pain related to his shoulder surgeries. [AR 987-988].

Mr. Morrison's medical records also show that he has recently sought treatment for ongoing neurological and cognitive issues.  Dr. Georganne R. Bley, conducted a neurological evaluation of Mr. Morrison on February 8, 2006. [AR 868-884].  The evaluation diagnosed Mr. Morrison as follows: "Cognitive Disorder NOS, mild"; "Anxiety Disorder NOS"; "R/O Bipolar Disorder NOS"; "Polysubstance Dependence, in Sustained Full Remission (per client report). [*Id.*].

On November 12, 2007, Mr. Morrison also saw Dr. James Hutcherson, MD to discuss Mr. Morrison's history of head injuries. [AR 989].  Then on December 17, 2007, Mr. Morrison saw Dr. Joshua N. Renkin, MD of Neurospciality Associates, PC, also for a neurologic consultation. [AR 944].  In a letter of that same date Dr. Renkin notes numerous cognitive and physical problems reported by Mr. Morrison, including: "anxiety, balance problems, bowel problems, chest pain, clumsiness, concentration difficulties, confusion, coordination problems, cough, depression, dizziness, fatigue, GI problems, headache, irregular heart beat, memory loss, numbness, tingling, sinus problems, skin problems, sleep disturbance, difficulties with smell, walking difficulties, and weakness." [AR 944].

Following the FCE evaluation, on May 16, 2008, Omaha Life sent a letter to Dr.

Renkin asking if he agreed with the results of the FCE that Mr. Morrison could return to work in a sedentary or light occupation for which he had the skills or training.  Dr. Renkin replied on May 22, 2008, stating that Omaha Life's assessment was reasonable. [AR 734].

### C.    Procedural History

#### 1.    Grant of Benefits Under the "Regular Occupation" Period

Mr. Morrison first submitted a claim for disability benefits in December 2005. Despite his history of cognitive issues and brain trauma, his initial request for disability benefits was premised on his rotator cuff tear and shoulder pain that resulted in the surgeries described above.  [AR 629].

On March 10, 2006, Omaha Life sent Mr. Morrison a letter approving his claim, and indicating that Mr. Morrison's benefits would commence as of November 30, 3005, (AR 1322).  The letter further indicated he would receive $9,464.00, representing benefits from November 30, 2005 to March 1, 2006 and that future benefits would be received on or about the 1st of each month. [AR 1322].  In the letter approving Mr. Morrison's application for LTD benefits, Omaha Life indicated that while the record supported his disability from performing the duties of his regular occupation, his medical records did not support his inability to perform the duties of any occupation. [AR 1322]. As such, Omaha Life informed Mr. Morrison that the "maximum benefit payable is 2 years, or to 11/30/2007," if he continued to meet the policy provisions. [AR 1321]. Omaha Life paid Mr. Morrison's LTD benefits through November 30, 2007–the entire 24-month "own occupation" period. [AR 126].

On August 2, 2007, Omaha Life sent Mr. Morrison a letter indicating its records showed that Mr. Morrison had not been treated by a physician for his disability since February 21, 2006. [AR 1039-42].  Omaha Life reminded Mr. Morrison that his benefits would not continue if he failed to provide Omaha Life with "satisfactory proof of continuous Disability" per the terms of the policy. [AR 1041].  Omaha Life further stated that Mr. Morrison's benefits were approved through August 31, 2007, but that all benefits past that date had been "pended until we receive additional medical records supporting your current disability." [AR 1041].

On August 27, 2007, Dr. Douglas Straehley drafted a letter indicating that Mr. Morrison had been under his care for a "complex left shoulder problem for which he has undergone surgery" and that Dr. Straehley felt it was "appropriate for him to have permanent lifting restrictions of no more than 10-15 pounds below chest height." [AR 994].

On September 26, 2007, Omaha Life wrote to Mr. Morrison, indicating that it had completed review of his application for LTD benefits, and indicating that his benefits under the "own occupation" period would not continue. [AR 1012-1017].  On October 17, 2007 [AR 1011], Mr. Morrison replied indicating that he had scheduled an appointment with Dr. Straehley and requesting clarification from Omaha Life about which additional records it required. [AR 1004-1007].  Mr. Morrison also noted that he had extensive records documenting a history of brain injury, and thus asked Omaha Life to clarify which records it wished to see.  Mr. Morrison also included a treatment note from Dr. Straehley's office [AR 1008-1010], dated September 19, 2007.

On October 31, 2007, Omaha Life responded, indicating that it had received Mr. Morrison's letter, which Omaha Life construed as a "letter of appeal" and stated that it needed more records. [AR 1000].  On November 30, 2007, Mr. Morrison faxed numerous medical records to Omaha Life, showing he had recently sought treatment for continuing health issues. [AR 986-999].

On December 5, 2007, Omaha Life overturned the denial of Mr. Morrison's benefits under the "own occupation" standard. [AR 982].  Omaha Life did not provide an explanation or reasoning as to what medical documentation specifically resulted in their decision.

## 2.  Denial of Benefits Under the "Any Occupation Period"

Just five days after Omaha Life sent Mr. Morrison a letter regarding his successful appeal with respect to the "own occupation" period of benefits, Omaha Life sent another letter reminding Mr. Morrison that at the end of the two-year period, a new definition of "disability" would apply to his claim. [AR 980].  Omaha Life indicated that it would review Mr. Morrison's claim under the new definition to see if benefits should continue beyond November 30, 2007, and further requested that Mr. Morrison fill out an additional health questionnaire. [AR 980-981].  Mr. Morrison did so. [AR 973-978].

As discussed briefly above, as part of the review into Mr. Morrison's claim for continued benefits, Omaha Life then scheduled a Functional Capacity Evaluation ("FCE") for April 22, 2008.  The result of the FCE placed Mr. Morrison in the sedentary classification category. [AR 801].  After the FCE, on July 2, 2008, Omaha Life sent Mr. Morrison a letter explaining that his claim for benefits had been denied. [AR 671-678].

Mr. Morrison responded on July 10, 2008 and sent more medical documents.  [AR 649-662].  On July 21, 2008, Omaha Life sent an amended denial letter. [AR 628-636].  On December 31, 2008, Mr. Morrison faxed Omaha Life a letter indicating that he wished to appeal the denial and requesting clarification about how long he would have to send in more documentation and medical records. [AR 521].  Mr. Morrison then sent numerous medical records to Omaha Life, many of which had already been received and reviewed.

On January 28, 2009, Omaha Life wrote to Mr. Morrison stating that it would re-evaluate the denial of his disability claim and that it would review the additional information he had provided. [AR 132].  Three months later, on April 21, 2009, Omaha Life sent Mr. Morrison a letter explaining it had completed review of his claims and that it was upholding the denial of his claim.  [AR 125-129].  Mr. Morrison sent another letter asking for reconsideration, correcting several errors he perceived in various doctors' reports [AR 54-55], and enclosing additional medical records, but Omaha Life replied that Mr. Morrison had already exhausted all of his administrative rights to appeal and that there would be no further review of his claim.  [AR 53].  Mr. Morrison filed this lawsuit on October 29, 2009.

## III.   ERISA Standard of Review

Where the parties in an ERISA case both move for summary judgment, "'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'"  *LaAsmar v. Phelps*

*Doge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quotation omitted).

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court established the basic framework for determining the standard of review in ERISA cases that challenge the denial or termination of benefits. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115.

In this case, there is no dispute that the policy contains a provision granting Omaha Life discretionary authority to determine eligibility for benefits. The policy states:

> By purchasing the policy, the Policyholder grants United of Omaha Life Insurance Company the discretion and the final authority to construe and interpret the policy. This means that united has the authority to decide all questions of eligibility and all questions regarding the amount and payment of any policy benefits with the terms of the policy as interpreted by United. In making any decision, United may rely on the accuracy and completeness of any information furnished by the Policyholder or an insured person. United's interpretation of the policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons.

[AR 7].

The parties nevertheless disagree about the standard of review given the adoption of C.R.S. § 10-3-1116, which became effective August 6, 2008. That statute limits the discretion that can be reserved to the insurer. C.R.S. § 10-3-1116(2) states:

> An insurance policy, insurance contract, or plan that is issued in this state that offers health or disability benefits shall not contain a provision purporting to reserve discretion to the insurer, plan administrator, or claim administrator to interpret the terms of the policy, contract, or plan or to determine eligibility for benefits.

Mr. Morrison argues that under C.R.S. § 10-3-1116(2) (the "Colorado statute"), the provision in the plan purporting to give discretionary authority to Omaha Life is invalid, and therefore that the standard of review must be *de novo*.  Omaha Life responds that ERISA expressly preempts C.R.S. § 10-3-1116(2) and further, that conflict preemption bars its application.  As such, Omaha Life contends that because the Colorado statute is inapplicable, the standard of review is abuse of discretion.

The Tenth Circuit has not had occasion to decide whether the Colorado statute is preempted by ERISA.[1]  However, the Tenth Circuit has conclusively held that the Colorado Statute does not apply retroactively.  *McClenahan v. Metropolitan Life Ins. Co.* 2011 WL 971061, at * 2 (10th Cir. March 21, 2011). ("[U]nder Colorado Supreme Court precedent, the statute here can't be applied to MetLife's claim determination, and the district court properly reviewed MetLife's decision in this case for abuse of discretion."). In *McClenahan,* the Tenth Circuit noted that the C.R.S. § 10-3-1116 "was enacted after all the events at issue had occurred, including the plan's formation and [the insurer's] denial of benefits."  *Id.*

In this case, I need not reach the question of whether ERISA preempts the Colorado Statute, because the Colorado Statute cannot be applied retroactively.  The Colorado Statute became effective August 6, 2008.  The effective date of the Policy between Omaha Life and Mr. Morrison is January 1, 2005, well before the effective date

---

[1]Notably, two other Colorado District Court Judges have considered whether ERISA preempts C.R.S. § 10-3-1116, and both held that it does not.  *See McLenanhan v. Metropolitan Life Ins. Co*, 621 F. Supp. 2d 1135, 1140-42 (D. Colo. 2009)(Judge Blackburn); *Kohut v. Hartford Life & Ass. Ins. Co*, 710 F.Supp.2d 1139, 1147-49 (D. Colo. 2008) (Judge Arguello).

of the Colorado Statute.  Omaha Life originally denied Mr. Morrison's claim on July 21,

2008 [AR 53], also before the effective date of the statute.  I therefore find that the

Colorado Statute does not apply.  To find otherwise would alter the defined obligations

and duties entered into by the parties "and would, in effect, create new and enhanced

obligations and duties" for Omaha Life.  *McClenahan v. Metropolitan Life Ins. Co.*, 621

F.Supp.2d 1135, 1143 (D.Colo. 2009).  Decisions from other district courts are in accord

when interpreting similar state regulations.  *See e.g. Marszalek v. Marszalek &*

*Marszalek Plan*, 485 F.Supp.2d 935, 938 (N.D.Ill.2007) (Holding that an Illinois

regulation prohibiting discretionary clauses in disability plans and other health insurance

contracts is not retroactive and therefore fails to invalidate discretionary clauses in

insurance policies issued prior to the effective date of the policies.); *Garvey v. Piper*

*Rudnick LLP Long Term Disability Ins. Plan,*  2011 WL 1103834, at * 2 (N.D.Ill. March

25, 2011) (same).

## IV.   ANALYSIS

Under the arbitrary and capricious standard, the administrator's decision will be

upheld "so long as it is predicated on a reasoned basis," and supported by substantial

evidence.  *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir.2006).

Substantial evidence means "more than a scintilla but less than a preponderance."

*Rekstad v. U.S. Bancorp.*, 451 F.3d 1114, 1119-20 (10th Cir.2006).  Further,

substantiality of the evidence is based upon the record as a whole.  *Caldwell v. Life Ins.*

*Co. of North America ,* 287 F.3d 1276, 1282 (10th Cir. 2002).  Indicia of arbitrary and

capricious decisions include lack of substantial evidence, mistake of law, and bad faith.

*Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004). "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one." *Rekstad*, 451 F.3d at 1119-20. Thus, the Court asks only "whether the administrator's decision resides somewhere on a continuum of reasonableness-even if on the low end." *Id.* (quotations and citations omitted).

The Supreme Court in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, ----, 128 S.Ct. 2343, 2351-2352 (2008), further held that there is an inherent conflict of interest where, as here, the same entity funds the plan and evaluates the claims. *See Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2344, 2348 (2008). This conflict does not necessarily affect the standard of review. Instead, I must weigh the conflict as one of many case-specific factors affecting whether the administrator abused its discretion in denying the claim. *Id.*; *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir.2009). I must employ a sliding scale approach by which the conflict is accorded more or less weight depending on its seriousness. *Glenn*, 554 U.S. at 2351. The conflict should be given greater weight "where circumstances suggest a higher likelihood that it affected the benefits decision" and less weight where the administrator has minimized the risk that the conflict would impact the benefits decision. *Id.*

Mr. Morrison contends that "procedural irregularities abound in the Administrative Record" which show Omaha Life's "adversarial role" and that make it such that Omaha Life's discretion "should be dial-backed [sic] to near-zero." (Pl.'s Resp. 22, ECF No. 45).

-14-

It is true that procedural irregularities may warrant a reduction in discretion afforded an insurer. *See e.g., LaAsmar v. Phelps Doge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quotation omitted).  In this case the arguments and points raised by Mr. Morrison are properly understood as also going to the merits of the case–that is, whether Omaha Life's denial of benefits was arbitrary and capricious.  I consider Mr. Morrison's arguments in turn.

### A.     The Social Security Administration Decision

Mr. Morrison received a fully favorable decision from the Social Security Administration ("SSA") dated December 16, 2008, which is part of the administrative record. [AR 226-236].  The favorable SSA decision came after the initial denial of Mr. Morrison's benefits under the "any occupation" standard, but well before April 21, 2009, when Omaha Life denied Mr. Morrison's appeal. [AR 125-129].  The SSA decision approved his award of Social Security Disability Insurance ("SSDI") benefits, finding that Mr. Morrison has the following "severe" impairments: "cognitive disorder with history of traumatic brain injury; anxiety disorder; obsessive-compulsive disorder; bilateral degenerative joint disease of the shoulders with massive rotator cuff arthropathy of the left shoulder; and degenerative disc disease of the lumbar spine." [AR 233].  The SSA decision concluded that the "evidence in this case shows the claimant's documented mental limitations result in deficits that would preclude the performance of even competitive remunerative unskilled work requiring the ability to interact appropriately with supervisors and co-worker on a sustained basis." [AR 236].  The decision further

held that given Mr. Morrison's "limited residual functional capacity, and the vocational factors including age, education, and work experience, there are no jobs existing in significant numbers that [Mr. Morrison] is capable of performing." [AR 236].

Omaha Life ignored Mr. Morrison's favorable SSA decision. Despite Omaha Life being in possession of the SSA decision, Omaha Life's denial letter did not include the decision in the list of information it considered in making its determination, nor did Omaha Life explain why it disregarded the SSA decision or why it's determination differed from the SSA decision. [AR 126].

Mr. Morrison argues that Omaha Life's discretion should be dialed-back given that it ignored the SSA decision after Omaha Life requested that Mr. Morrison apply for social security benefits. (Pl.'s Mot. Summ J. 23). Citing the Supreme Court's decision in *Glenn*, 128 S. Ct. at 2349-50, Mr. Morrison argues that it was improper for Omaha Life to encourage a claimant to apply for social security benefits and then ignore the agency's finding with respect to disability.

Omaha Life responds that Social Security rules do not govern the procedures for determining claims governed by ERISA and further, that a disability insurer need not give weight to a SSA disability determination. (Def.'s Mot. Summ. J. 42, ECF No. 38). Omaha Life also notes that the SSA indicated that Mr. Morrison retained the residual functional capacity to perform light work, but that his loss of ability to interact appropriately with others supported an award of benefits by the SSA. [AR 236]. Omaha Life argues that loss of social functioning was not the result of Mr. Morrison's head injury and was not an "injury" or "sickness" as defined under the plan at issue. (Def.'s

Resp. 42).

As an initial matter, it is apparent that a claim for benefits under ERISA turns on the particular terms of the plan at issue, and therefore that Social Security rules do not govern ERISA cases.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003).  As such, a contrary SSA determination does not necessarily render Omaha Life's denial of benefits arbitrary and capricious.  *See Wagner-Harding v. Farmland Indus. Inc. Employee Retirement Plan*, No. 01-3085, 2001 WL 1564041, at *5 (10th Cir. Dec. 10, 2001)(noting the different standards and bodies of law governing disability determinations under SSA and ERISA));  *Buzby v. Metropolitan Life Ins. Co.,* 2008 WL 2834202, at *5 (D.Colo. July 21, 2008) (holding that a disability insurer need not adhere to a disability determination).

It is also clear, however, that an administrator's encouragement to a plaintiff to apply for SSDI benefits and its subsequent failure to consider the SSA determination of disability is a serious concern that needs to be considered when evaluating the administrator's conflict of interest.  *Glenn*, 128 S.Ct. at 2352.

The record in this case shows that Omaha Life specifically instructed Mr. Morrison to apply for social security benefits [AR 1201] and provided some assistance to him in doing so. [AR 185].  Although Omaha Life did not become intimately involved in Mr. Morrison's application for social security benefits, Omaha Life did refer Mr. Morrison to a law firm [AR 185] and did encourage Mr. Morrison to apply for social security.  Then, when Mr. Morrison received a favorable decision from the SSA, Omaha Life disregarded that decision.  Omaha Life did not provide the decision to its

independent medical reviewers, Dr. Topper and Langa, and further, in its denial of benefits, Omaha Life did not explain why its opinion differed from the SSA as to Mr. Morrison's disability. [AR 125-129].

Under Tenth Circuit precedent, I must take these facts into account when weighing Omaha Life's conflict of interest. *See Brown v. Hartford Life Ins. Co.*, 301 Fed. Appx. 772 (10th Cir. 2008) (unpublished decision). Relying on *Glenn*, the Tenth Circuit in *Brown* specifically noted the such conduct must be considered:

> The reviewing court should have factored the inconsistency created by Hartford's instructing Mr. Brown to apply for SSD and reaping the benefits of his successful determination, then summarily rejecting the evidentiary value of that decision almost without comment, into its determination of whether Hartford acted arbitrarily and capriciously in denying benefits.

*Id.* at 776 (citing *Glenn*, 128 S. Ct. at 2352). Here, as in *Brown*, the Defendant stands to gain from a favorable SSA decision, yet it did not consider the opinion of the SSA in denying benefits. While not arbitrary and capricious *per se*, Omaha Life's failure to consider the SSA's decision is a factor suggesting its actions were arbitrary and capricious. Mr. Morrison submitted the decision to Omaha Life and it should have been considered. I accord substantial weight to Omaha Life's decision not to follow the SSD decision, and include it as a significant factor in my overall analysis.

### B.   The Functional Capacity Evaluation

Next, Mr. Morrison argues that Omaha Life relied on an inconsistent Functional Capacity Evaluation ("FCE"). (Pl.'s Mot. Summ. J. 24). Mr. Morrison points to various perceived problems with the FCE and argues that it was "inappropriate" to do an FCE on a "cognitively impaired, occasionally very emotional person." (*Id.*). Mr. Morrison

further argues that the FCE did not evaluate his cognitive capacity and that no evaluation was made as to Mr. Morrison's pain level the day following the FCE.

Omaha Life responds that "there is no evidence that the FCE is invalid simply because Plaintiff resisted the testing" and further that the FCE is "fully consistent with the restrictions that Plantiff's own physicians placed on his work activities." (Def.'s Resp. 43).

I disagree that the results of the FCE are "fully consistent," with the opinions of Plaintiff's own physicians.  For example, Dr. Straehely specifically indicated that Mr. Morrison has permanent physical limitations and that he did not agree with the findings of the FCE. [AR 179].  Nevertheless, I do not find the FCE to be so flawed as to deprive it of any utility in assessing Mr. Morrison's physical limitations.  *Chalker v. Raytheon Co.* 291 Fed.Appx. 138, 144 (10th Cir. 2008).

### C.    Transferrable Skills Analysis

Next, Mr. Morrison argues that the Transferrable Skills Analysis ("TSA"), performed on May 14, 2008 by Lisa Hammers, MS, was "defective."  (Pl.'s Mot. Summ. J. 25).  Mr. Morrison argues that the May 2008 TSA, which was a paper-review of Mr. Morrison's records, is contradicted by an earlier TSA performed on March 27, 2006, which included in-person meetings with Mr. Morrison (*Id.*).  Mr. Morrison further argues that the May 2008 TSA did not include a review of the SSA decision, which included a separate transferrable skills analysis.  Third, he argues that the jobs listed in the TSA do not actually exist in the economy.  And finally, Mr. Morrison states that the jobs included in the TSA are not relevant, because they do not pay at least 60% of his pre-disability

wage. (*Id.* at 27).

Omaha Life responds that Mr. Morrison is attempting to shift the burden to Omaha Life to demonstrate that Mr. Morrison is capable of working in a gainful occupation. (Def.'s Resp. 44).  Omaha Life further contends it was not required to investigate whether the positions identified in the TSA were available in sufficient numbers in the relevant geographic area.  (Def.'s Resp. 45).  Finally, Omaha Life contends that it is reasonable to conclude that the positions identified in the plan would provide gainful wages, given that "gainful occupation" is defined by the Plan as "an occupation that by training, education, or experience is or can be expected to provide [the claimant] with current earnings equal to 60% of Basic Monthly Earnings within 12 months of [the claimant's] return to work." [AR 22].

I find numerous problems with Omaha Life's reliance of the TSA by Ms. Hammers.  First, I agree that the TSA by Ms. Hammers was based on inadequate information.  She should have been provided with enough information regarding Mr. Morrison's cognitive and social skills to provide an accurate assessment of Mr. Morrison's capacity to work in certain jobs.  She was not provided with the SSA decision or Mr. Morrison's previous TSA, both of which would have helped her evaluate Mr. Morrison's ability to return to work.  In fact, the overview section of the TSA report states that the file was referred to Ms. Hammers to "determine occupations transferable to Mr. Morrison based on the reported education, employment history, and *physical capabilities.*" [AR 771] (emphasis added).  Her report makes no mention of Mr. Morrison's cognitive limitations.  Likewise in Omaha Life's denial, it wrote that

information regarding Mr. Morrison's *physical* capabilities was used to help complete the TSA to determine if he had the transferrable skills necessary to perform any occupation. The denial letter then lists the occupations from the TSA and describes them as occupations for which he Omaha Life believes Mr. Morrison has "the physical *and mental* capabilities to perform." [AR 128]. The TSA, however, did not take Mr. Morrison's cognitive limitations into account. Without an accurate picture of Mr. Morrison's cognitive limitations, including his reasoning skills, Ms. Hammers could not have selected jobs for which he is reasonably qualified.

Furthermore, Ms. Hammers did not correctly analyze whether the jobs noted in the TSA would provide Mr. Morrison with a wage equal to 60% of Basic Monthly Earnings within 12 months of his return to work, as required by the policy. Although Omaha Life's denial letter states that the occupations listed in the TSA are "appropriate in regards to gainful wages" – the record indicates otherwise. Mr. Morrison previously earned $5,200 per month which is equivalent to $30 per hour. Sixty percent of his basic monthly earnings is $18.00 per hour. The highest paying job listed in the TSA pays only $15.78 per hour. Omaha Life argues that the TSA relied on an outdated wage table, and implies that a current wage table would provide for higher earnings. Omaha Life further argues that the wage could rise to $18 within 12 months, as provided by the policy. I find these arguments to be speculative. Even failing to account for Mr. Morrison's cognitive limitations and lack of transferrable social skills, no jobs were identified that would pay sixty percent of Mr. Morrison's earnings, or even come within $2.00 of that wage. Omaha Life has therefore failed to make adequate findings

regarding Mr. Morrison's ability to perform all the material duties of any occupation.

**Accordingly, I find that Omaha Life abused its discretion in relying on the TSA.**

### D.      Issues Regarding the Medical Review by Drs. Topper and Langa

Next, Mr. Morrison makes a series of arguments related to the record review by

Drs. Leonid Topper and Victoria Langa (the "medical reviewers").  Dr. Topper is a board

certified neurologist and Dr. Langa is a board certified orthopedic surgeon. [AR 121].

Both doctors reviewed medical records provided by Omaha Life, ranging in time from

November 1896 through January 2009. [AR 106-107].  The report by the medical

reviewers concludes that Mr. Morrison is not incapable of performing the essential tasks

and duties of any occupation.

### 1.      Failure to Provide the Medical Reviewers with Complete Records

Mr. Morrison argues that Omaha Life did not provide the medical reviewers with

certain records that support Mr. Morrison's disability, including: (1) the SSA decision; (2)

correspondence from Mr. Morrison to the company that conducted the FCE; (3) certain

records from HealthSouth; (4) medical records from Dr. Renkin dated June 24, 2008; (5)

medical records from Dr. Hutcherson from May 2009; and (6) records from Evergreen

Physical Therapy.  I agree with Mr. Morrison that Omaha Life's failure to provide certain

documents to Drs. Topper and Langa and Omaha Life's subsequent heavy reliance on

their report, shows bias on the part of Omaha Life.

First, although the medical reviewers are not required to follow the SSA decision,

providing it would have gone a long ways towards showing good faith on the part of

Omaha Life.  Mr. Morrison provided the December 16, 2008 SSA decision to Omaha

Life well before the medical reviewers drafted their report.

Second, Mr. Morrison argues that a letter from Mr. Morrison to Layne Physical Therapy, the company that conducted the FCE for Mr. Morrison, should have been provided to the medical reviewers.  In his letter, Mr. Morrison notes his belief that the FCE left out data from its report. [AR 668].  Because Omaha Life provided the medical reviewers with the response from Dr. John DeSiato, I agree that it should have included the initial letter from Mr. Morrison and that not doing so presented the medical reviewers with one-sided information.

Third, Mr. Morrison argues that the records from HealthSouth physical therapy, which are dated from 2004 to 2005 should have been provided.  Omaha Life argues that those records are irrelevant as they do not reflect Mr. Morrison's physical condition in November 2007. (Def.'s Resp. 52).  But Omaha Life sent numerous other records from that time frame to Drs. Topper and Langa for review.  In the same breath that Omaha Life argues that the HealthSouth records were irrelevant because they were from an earlier time frame, Omaha Life also argues that the assessment of the medical evidence by Drs. Topper and Langa "was more comprehensive than the opinions provided by Plaintiff's treating physicians" because the medical reviewers "reviewed Plaintiff's records from 1986 through the date of their report in April 2009."  Omaha Life should have provided the documents from HealthSouth.

Fourth, Omaha Life should have provided a letter from Dr. Renkin dated June 24, 2008 [AR 621] to Drs. Topper and Langa.  I agree that the letter contains a discussion of Mr. Morrison's symptoms, diagnoses and treatment and therefore is in the nature of a

medical record.  As for the records from Dr. Hutcherson dated May 7 and May 8, 2009, however, such records were generated after the report by the medical reviewers.  Mr. Morrison's arguments with respect to those records are therefore unavailing.

Finally, Mr. Morrison argues that Omaha Life should have provided the reviewers with medical records from Evergreen physical therapy.  Omaha Life responds that these records are from 2008, after Omaha Life had rendered its decision denying Plaintiff's claim for benefits.  By letter of January 29, 2009, however, Omaha Life agreed to reevaluate Mr. Morrison's claim, and to consider additional documentation.  Omaha Life wrote: "We welcome the opportunity to review additional information you have provided and to re-evaluate the claim determination." [AR 132].  Omaha Life therefore agreed to consider additional information.

Although I agree with Omaha Life that it is reasonable to rely on the opinions of independent medical reviewers, such reliance is misplaced if the reviewers did not have all relevant information.  Furthermore, Omaha Life provides insufficient justification for failing to provide the medical reviewers with several of these categories of documents.  While many of the treatment documents are similar to documents reviewed by Drs. Topper and Langa, I cannot say the opinions of the medical reviewers would not have been influenced by the inclusion of additional documentation supporting Mr. Morrison's limitations.  The omission of these medical records leaves the impression that Omaha Life was acting in its self-interest and tends to show that Omaha Life acted arbitrarily in its review of Mr. Morrison's claim.

## 2.      Bias on the Part of the Medical Reviewers

Mr. Morrison's arguments regarding the bias and credentials of the medical reviewers are less compelling.  Drs. Topper and Langa are independent physicians, hired through a third-party vendor.  They are board certified in their fields, and are not employees of Omaha Life.  Hiring independent physicians is a step recognized by the Tenth Circuit that reduces the inherent bias of an insurer.  *See e.g. Holcomb v. Unum Life Ins. Co. of America*, 578 F.3d 1187, 1193 (10th Cir. 2009) ("Unum took steps to reduce its inherent bias by hiring two independent physicians...").  The court decisions cited by Mr. Morrison in which various Judges analyzed the work of Dr. Topper do not show a history of bias by these reviewers.

Mr. Morrison also argues that certain medical reports have been "cherry-picked" by Drs. Topper and Langa. (Pl.'s Mot. Summ. J. 32).  In particular, Mr. Morrison takes issue with the portions of the report summarizing a medical evaluation by Dr. Ben Alderfer on February 26, 2007 and a medical evaluation by Dr. Hutcherson on November 4, 2008.  On this account, I agree that the summaries included in the medical report do not include the full details of Dr. Alderfer's or Dr. Hutcherson's report.  But that is the nature of a summary report.  Drs. Topper and Langa stated that they reviewed all of the medical records submitted to them [AR 121] and then they summarized certain relevant pieces from those records.

### E.    Combination of Factors Analysis

In reviewing Omaha Life's decision to deny Mr. Morrison's claim for LTD benefits, the issue is whether Omaha Life abused its discretion in finding that Mr. Morrison was not disabled within the meaning of the plan.  In resolving this issue, I may

not substitute my own judgment for that of Omaha Life and may set aside Omaha Life's decision only if it was arbitrary and capricious.

Applying the "combination of factors" analysis, and applying the level of skepticism I am required given Omaha Life's inherent conflict of interest and its failure to consider the SSA decision, **I find that Omaha Life acted arbitrarily and capriciously in denying Mr. Morrison's benefits.** Omaha Life was not bound by the SSA decision, but it was not free to act as if it did not exist, especially given that Omaha Life encouraged Mr. Morrison to apply and referred him to a law firm that could assist him in doing so. Furthermore, Omaha Life relied on the report of its medical reviewers Drs. Topper and Langa, but it did not provide the reviewers with numerous documents and did not provide a sufficient justification for this failure. Finally, Omaha Life relied on a TSA report that did not take into account the complete picture of Mr. Morrison's limitations, relied on outdated information, and did not point to any jobs that could provide Mr. Morrison with income equivalent to 60% of his previous income within 12 months of his return to work. Taken together, these failures require me to find that Omaha Life did not make adequate findings with respect to Mr. Morrison's disability and that it abused its discretion in the process of reviewing Mr. Morrison's claim.

## V.   CONCLUSION

ERISA requires that Mr. Morrison receive a full and fair review of his claim. Where a plan administrator "fails to make adequate findings or to explain adequately the grounds" for its decision, the most prudent course of action "is to remand the case to the administrator for further findings or explanation." *Caldwell v. Life Insurance Co. of N.*

*America*, 287 F.3d 1276, 1288 (10th Cir. 2002); *accord DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006).  Accordingly,

**I find that remand is appropriate and I hereby remand this matter to Omaha Life to reevaluate Mr. Morrison's claim based on the factors, considerations, and rulings contained in this Order.**

Dated:  July 1, 2011

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge